UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**SILVERHORSE RACING, LLC,**

    **Plaintiff and Counterclaim, Defendant,**

v.                                                                                     Case No: 6:16-cv-00053-ACC-KRS

**FORD MOTOR COMPANY,**

    **Defendant and Counterclaimant.**

---

**FORD MOTOR COMPANY,**

    **Third-party Plaintiff,**

v.

**JOSEPH CANITANO**

    **Third-party Defendant.**

---

**ORDER**

This cause comes before the Court on Defendant Ford Motor Company's Motion for Partial Summary Judgment and Memorandum of Law (Doc. 33); Plaintiff, Silverhorse Racing, LLC's Response (Doc. 38); and Ford Motor' Company's Reply (Doc. 40). Upon review and consideration, Ford's motion will be granted.

    **I.  BACKGROUND[1]**

**A. Factual Background**

---

[1] As discussed in Section II of this Order, SHR has failed to contest or even address the "undisputed facts" set forth in Ford's motion for summary judgment. Therefore, many of the facts in the "Background" section of this Order are taken from Ford's motion for summary judgment. (*See* Doc. 33, pp. 3–8 (listing twenty-six "undisputed material facts")).

This action arises from a dispute between Silverhorse Racing, LLC ("SHR") and Ford Motor Company ("Ford") regarding use of the marks "GT" and "5.0." (Doc. 2). Ford manufactures and sells automobiles, parts, accessories, and merchandise. (Doc. 30 ¶ 7). SHR, whose sole owner is Joseph Marcello Canitano, produces aftermarket parts for the automotive industry. (Doc. 2 ¶¶ 5–15; Doc. 39-1 ¶¶ 2, 4).

Ford introduced the Ford Mustang automobile in 1964, and began using GT® in connection with the now iconic automobile in 1965. (Doc. 33, ¶ 2). In 1969, production of the Ford Mustang ceased, but resumed in 1982, when Ford began selling Ford Mustang GT® automobiles. (*Id.*). "In 1978, Ford introduced its 5.0® performance engine, designed specifically for the Mustang GT® models." (*Id.* ¶ 4). Ford currently sells parts and accessories designed for Ford Mustang automobiles under registered trademarks GT® and 5.0® and has used them continuously since the "date of first use" shown in the table below. (*Id.* ¶¶ 1, 4).

| Trademark | U.S. Reg. No./ Image | Date of Reg./ Date of First Use | Goods and Services |
|---|---|---|---|
| GT | 3,968,489 | May 31, 2011/ Sep. 1, 2004 | Automobiles; exterior insignia badges for automobiles |
| 5.0 | 4,466,709 | Jan. 14, 2014/ Jun. 8, 2012 | Clothing and headwear, namely, t-shirts, polo shirts, caps, hats, sweatshirts and jackets |

In 2006, well after Ford had begun using the marks GT® and 5.0®, SHR began advertising and selling parts and accessories (rear medallions, cup holders, and shifter bezels) designed for Ford Mustang automobiles bearing the letters GT and numbers 5.0. (*Id.* ¶ 5). Examples of the engraved products at issue are depicted below.

2



(*See* Doc. 35-1 & Doc. 35-2) (providing screenshots of SHR's parts and accessories engraved with the letters GT and numbers 5.0). SHR marketed these products to an identical class of consumers and through similar channels of trade as Ford. (Doc. 33 ¶ 15–21). However, "SHR . . . has never been licensed by Ford." (*Id.* ¶ 14).

On April 3, 2013, Ford sent SHR a letter, demanding that it cease all unauthorized use of trademarks belonging to Ford. (Doc. 33-9). Despite the exchange of communications between the parties, the dispute regarding Ford's registered trademarks went unresolved. (Doc. 39-1 ¶¶ 30; Doc. 35-3). Six months later, law enforcement raided a warehouse belonging to SHR's largest dealer, American Muscle. (Doc. 34 ¶ 16; Doc. 39-1; Doc. 35-3). The raid resulted in the seizure of SHR products engraved with the letters GT. (Doc. 34 ¶ 16; Doc. 39-1).

Following the raid, Ford began sending demand letters ("Demand Letters") to companies with whom SHR had business relationships. In particular, Ford sent a demand letter to CJ Pony Parts on February 27, 2014, requesting that it remove all unlicensed and infringing SHR products from their website, turnover any inventory in its possession, and provide disclosures for the sales of these products. (Doc. 35-4). On October 6, 2015, Ford also contacted Mustangs Unlimited and requested that it remove unlicensed and infringing SHR products from its website. (Doc. 35-5; Doc. 35-6). After receiving Ford's Demand Letters, CJ Pony Parts and Mustangs Unlimited stopped advertising and selling SHR's engraved parts and accessories. (Doc. 39-1, ¶¶ 32, 34).

B.  **Procedural Background**

On November 23, 2015, Plaintiff SHR initiated a lawsuit against Ford in state court, asserting a claim for "tortious interference" premised on the Demand Letters Ford sent to SHR's distributors. (Doc. 2 ("Complaint")). On January 13, 2016, Ford timely removed the suit to federal court. (*Id.*). Ford subsequently moved to dismiss SHR's Complaint, arguing that its Demand Letters could not form the basis of a claim for tortious interference because it was immune from liability under the longstanding *Noerr-Pennington* ("*Noerr*") doctrine. (Doc. No. 9). SHR opposed Ford's motion (Doc. 12), and Ford replied (Doc. 17). The Court concluded that Ford may be entitled to immunity, but ultimately denied Ford's motion because SHR pled sufficient facts creating a plausible inference that Ford's Demand Letters were a sham unworthy of protection under the *Noerr* doctrine. (Doc. 27, 7–10).

On May 11, 2016, Ford filed an answer to SHR's Complaint, along with several counterclaims and a third-party complaint against Canitano. (Doc. 28). Shortly thereafter, Ford amended its counterclaims and third-party complaint, asserting that both SHR and Canitano were liable for: (1) federal trademark counterfeiting and infringement under 15 U.S.C. ¶ 1114; (2) false designation of origin and trade dress infringement under 15 U.S.C. § 1125(a); (3) trademark and trade dress dilution under 15 U.S.C. ¶ 1125(c); and (4) trademark infringement under Florida law. (Doc. 30). Ford now moves for partial summary judgment on SHR's claim for tortious interference. (*See* Doc. 33 ("Motion")). SHR responded (Doc. 38 ("Response")), and Ford replied (Doc. 40). This matter is therefore ripe for adjudication.

## II.  LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ.

4

P. 56(a). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If a movant carries its burden the burden shifts to the non-moving party, who must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986) (internal quotations and citations omitted).

SHR has failed to comply with Rule 56 and the Court's Case Management and Scheduling Order.[2] In its response, SHR does not specifically dispute or challenge the "statement of undisputed material facts" contained in Ford's motion for summary judgment. (*See generally*, Doc. 38). Moreover, SHR fails to cite to any evidence in the record. SHR merely submits a thirty-two page Affidavit of Canitano (Doc. 39-1), which supposedly "establishes genuine issues of material fact . . ." (*Id.* at 8). Notably, however, SHR neglects to cite to any specific portions of Canitano's lengthy Affidavit, leaving the Court to ponder which of Ford's asserted facts are actually in dispute.

A district court need not consider materials not cited by the parties, *see* Fed. R. Civ. P. 56(c)(3), and may decide a motion for summary judgment "without undertaking an independent search of the record," *see* Rule 56(c)(3) Advisory Committee's Note 2010 Amendments. Because SHR fails to properly address Ford's assertions of fact, the Court considers those facts undisputed. *See* Rule 56(e) (explaining that, "[i]f a party fails to properly support an assertion of fact or fails

---

[2] (*See* Doc. 20, pp. 5–6 (explaining that the non-moving party must: (1) specifically challenge those facts a moving party claims to be undisputed; and (2) "provide pinpoint citations to the pages and lines of the record supporting each material fact")).

to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion).

### III. DISCUSSION

Ford argues that the conduct forming the basis of SHR's claim is privileged under the First Amendment. Specifically, Ford asserts that its act of sending Demand Letters to SHR's distributors constituted litigation activity immunized from civil liability under the *Noerr* doctrine. For the reasons that follow, the Court agrees.

The *Noerr* doctrine derives from the First Amendment's guarantee of "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. The doctrine applies to persons who petition all types of government entities, including legislatures, administrative agencies, and courts, *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002) (citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11 (1972)). Although the *Noerr* doctrine initially arose in the antitrust context, *see E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136–38 (1961), courts have extended the *Noerr* doctrine to protect First Amendment "petitioning of the government from claims brought under federal and state laws including . . . common-law tortious interference with contractual relations," *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc*., 858 F.2d 1075, 1084 (5th Cir. 1988); (*see* Doc. 27, p. 5) (collecting cases).

Most pertinent here, the doctrine extends not only to petitioning of the judicial branch (i.e., filing a lawsuit), but also to acts reasonably attendant to litigation, such as demand letters. *See Primetime 24 Joint Venture v. Nat'l Broad. Co*., 219 F.3d 92, 99-100 (2d Cir.2000) (collecting cases). The *Noerr* doctrine, however, is not absolute. To receive immunity, the conduct at issue

cannot fall within the "sham exception" to the *Noerr* doctrine. In other words, the litigation activity must be genuine. *BE & K Constr. Co.*, 536 U.S. at 525–26.

The burden falls on the party invoking the sham exception. First, the party must show that the litigation activity was "objectively baseless, in the sense that no reasonable litigant could realistically expect success on the merits." *Prof'l Real Estate Investors v. Columbia Pictures Indus., Inc.* (*PRE*), 508 U.S. 49, 60. If an objective litigant could conclude that the [litigation activity] is reasonably calculated to elicit a favorable outcome, the [litigation activity] is immunized under [the] *Noerr* [doctrine]." *PRE*, 508 U.S. at 60. If the "objectively baseless" standard is met, the party must then show that the petitioning party had the subjective intent to inhibit competition, rather than to seek government redress. *Id.* at 60–61 (citations and internal quotations omitted).

In the instant case, SHR does not dispute that the *Noerr* doctrine extends to Ford's Demand Letters. Instead, SHR argues that Ford's conduct falls within the "sham exception" to the *Noerr* doctrine. In support of its assertion, SHR relies solely upon its first four affirmative defenses (laches, acquiescence, estoppel, unclean hands) to Ford's counterclaims (trademark infringement, false designation of origin, and dilution). From what the Court can decipher, SHR essentially argues that because its affirmative defenses will bar Ford's counterclaims, Ford's Demand Letters were a sham. The Court is unpersuaded.

First, the subjective strength of SHR's affirmative defenses are not determinative of whether Ford's Demand Letters were a sham. *See Select Comfort Corp. v. Sleep Better Store, LLC*, 838 F. Supp. 2d 889, 899 (D. Minn. 2012) (explaining that "whether [a] demand letter is a "sham" does not depend on [the litigants] ultimate success . . . in pursuing its trademark infringement claims") (citing *BE & K Constr. Co.*, 536 U.S. 516 at 531–32 (2002). Second, Ford is not moving

7

for summary judgment on its counterclaims. Ford is moving for summary judgment on SHR's claim for tortious interference on grounds that it is entitled to immunity under the *Noerr* doctrine. Thus, SHR must "demonstrate[e] both the objective and the subjective components of a sham." *PRE*, 508 U.S. 49, 61. Here, SHR fails to do so.

SHR has not raised a disputed issue of material fact as to whether Ford's Demand Letters were a sham. Based on the undisputed evidence, at the time Ford sent Demand Letters to SHR's distributors, it owned registered trademarks 5.0s® and GT®. (Doc. 33 ¶ 4). Ford used these marks in connection with parts and accessories designed for Ford Mustang autos. (*Id.* ¶ 5). Despite Ford's ownership of registered trademarks 5.0s® and GT®, SHR advertised and sold parts and accessories designed for Ford Mustang automobiles bearing the letters GT in stylized form and the numbers 5.0. (*Id.* ¶ 5). SHR marketed its parts and accessories to the same consumers as Ford. (*Id.* ¶¶ 15–24). An objective litigant could therefore conclude that Ford's Demand Letters were reasonably calculated to elicit a favorable outcome—*i.e.* the cessation of what Ford believed to be infringing SHR products. Presuit demand letters are customarily used as the first formal step in the process of enforcing the law of intellectual property and vindicating economic interests in intellectual property. Accordingly, the Court does not find that Ford's Demand Letters were objectively baseless.

Having found no evidence that Ford's Demand Letters were objectively baseless, the Court need not examine Ford's subjective intent. *See PRE*, 508 U.S. at 50 (explaining that a court may examine the litigant's subjective motivation "[o]nly if challenged litigation is objectively meritless may motivation"). However, the Court notes that SHR has failed to proffer any evidence demonstrating that Ford sent Demand Letters to SHR's distributors in bad faith or with anticompetitive intent. Moreover, the evidentiary record, particularly Ford's Demand Letters

(Docs. 33-9, 35- 4, & 35-5), suggests that Ford contacted SHR and its distributors simply to protect Ford's registered GT® and 5.0® marks from confusion and dilution.

Absent evidence that Ford's Demand Letters were a sham, the *Noerr* Pennington doctrine immunizes Ford from SHR's tortious interference claim. Ford's motion for partial summary judgment is therefore due to be granted, and SHR's Complaint, which asserts a single claim for tortious interference, is due to be dismissed.

### IV.  CONCLUSION

Based on the foregoing, it is ordered as follows:

1. Ford Motor Company's Motion for Partial Summary Judgment and Memorandum of Law (Doc. 33) filed December 5, 2016, is **GRANTED**.

2. Plaintiff, Silverhorse Racing, LLC's Complaint (Doc. 2) filed January 13, 2016, is **DISMISSED**.

**DONE** and **ORDERED** in Orlando, Florida on January 30, 2015.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties